In re CITY STORES COMPANY, d/b/a Maison, Blanche, Loveman's, Richards, Hearns, R.H. White, Franklin Simon, B. Lowenstein & Bros., Incorporated, W. & J. Sloane, Inc., the Mayer Furniture Co., d/b/a W. & J. Sloane, Debtors,

v.

The MALL, INC., Claimant.

Nos. 81 Civ. 5134–CSH, 82 Civ. 6091–CSH.

United States District Court, S.D. New York.

July 11, 1984.

Proskauer, Rose, Goetz & Mendelsohn, New York City, for debtor City Stores; Stephen Rackow Kaye, Stephen E. Tisman, New York City, of counsel.

Edward J. Schwarz, New York City, for claimant The Mall.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

These related appeals are taken from two rulings of Chief Bankruptcy Judge Edward J. Ryan during the Chapter XI bankruptcy proceedings of debtor City Stores Company ("City Stores").

Among the many enterprises run by City Stores before its bankruptcy was a department store called Loveman's. Loveman's leased space in a Huntsville, Alabama shopping mall owned by The Mall, Inc. ("the Mall"), appellant in the first appeal and appellee in the second appeal. Following the bankruptcy City Stores exercised its statutory option to assume the lease, but it was eventually forced by circumstances to discontinue operation of the Loveman's department store and vacate the leased space. City Stores set out to find a new tenant to assume the lease and re-occupy the vacant store, eventually enlisting the aid of the Mall. Both parties found potential tenants and signed conditional agreements of assignment. City Stores' candidate, Hills, agreed to move in if certain changes could be made in the configuration of the premises. The Mall's candidate agreed to move in if the Mall could secure possession for it before August 31, 1980.

When City Stores sought to assign the lease to Hills, the Mall objected on the grounds that the installation of Hills would violate the lease and that the Mall had earlier terminated the lease because City Stores had breached it by vacating the premises. By Order to Show Cause dated

August 12, 1980, City Stores sought an order from Chief Judge Ryan approving the assignment to Hills. The Chief Judge quickly began taking testimony on the factual issues involved, ultimately holding six non-consecutive days of evidentiary hearings. On January 21, 1981, Chief Judge Ryan rendered a judgment, amplified by a February 26, 1981, decision, which held that any breach of the lease had been waived and that installation of Hills would not necessarily violate the lease and could proceed. The Mall, however, had virtual veto power over the structural changes Hills requested. It exercised this power, and Hills never accepted assignment of the lease. The January judgment was never appealed and is now final.

While City Stores' request for an order approving the assignment was *sub judice,* the deadline for the Mall's securing the store for its candidate expired, and that candidate withdrew its offer. This cost the Mall a substantial profit. The store, which had been vacant since the April, 1980 departure of Loveman's, remained empty.

Shortly before the scheduled confirmation of the City Stores plan of reorganization, on April 13, 1981, the Mall filed a claim with the Bankruptcy Court for $1.6 million in connection with the Loveman's debacle. Not long after, on May 27, 1981, it filed a second claim arising out of the same transaction for $10 million. City Stores moved to expunge both claims. Chief Judge Ryan's disposition of the first claim is the subject of the second appeal; his dismissal of the second claim gave rise to the first appeal.

*The Mall's Appeal (No. 81 Civ. 5134)*

In justifying its $10 million claim, the Mall submitted the following statement:
3. The consideration for this debt [or ground of liability] is as follows:
City Stores affirmed the Lease. Thereafter, City Stores knowingly, intentionally, wilfully and punitively breached the lease by abruptly terminating the operation and ceasing to use and occupy its Huntsville, Alabama store. City Stores'

violation of the Lease has damaged and will continue to damage The Mall, Inc. for the balance of the term of the lease. Said damages will amount to $10,000,000. in lost revenue and decline in the value of the shopping center.

After City Stores had submitted papers in support of its motion to expunge this claim, the Mall submitted an affidavit by its attorney, Mr. Schwarz, which, while purporting to explain this claim, stated what appear to be entirely different grounds for recovery. The affidavit substituted a tort theory of intentional interference with contract for the contract theory stated in the claim. Mr. Schwarz alleged that City Stores' deal with Hills lapsed six days after the filing of the Order to Show Cause and that City Stores thereafter pursued its presumably futile litigation of the legitimacy of the assignment to Hills solely to disrupt the Mall's efforts to install its own candidate.

On June 3, 1981, Chief Judge Ryan held a hearing on the motion to expunge the claim. After an aborted trial, he entered a summary order, dated June 10, 1981, which expunged the claim on the following grounds:

(1) The May 27 Claim is barred by *res judicata* and collateral estoppel by reason of this Court's prior Findings and Judgment dated January 21, 1981.

(2) The May 27 Claim is barred by *res judicata* and collateral estoppel by reason of this Court's Order dated May 28, 1981.

(3) The May 27 Claim is also barred because, under the unambiguous terms of the Lease and in law or equity, the alleged consequential or punitive damages are unavailable by reason of or arising from the claimed breach of the Lease.

This is the order which the Mall appeals, contending that none of the prior bankruptcy proceedings should serve as a bar to this claim and that item (3) of Chief Judge Ryan's order is irrelevant to its true claim.

Although there is a serious question as to whether the Mall's tort claim was ever

properly before Chief Judge Ryan, no formal motion to amend ever having been made, I will assume for purposes of this appeal that it was.[1]

City Stores has argued several grounds for affirming the order of the bankruptcy court. I consider first the issue of collateral estoppel. The premise of the Mall's current claim is that Hills' offer to assume the lease expired on August 18, 1980, only a few days after City Stores' Order to Show Cause and long before the January 21 end of the lease hearings. Nevertheless, it is alleged, City Stores officials continued to press the adjudication while knowing that it was in fact moot so as to prevent the Mall from installing its candidate, whose offer expired on August 31. Central to this theory is the factual question of when Hills' offer expired. To prevail the Mall must demonstrate that no serious offer to assume the lease existed after, at the latest, August 31. It is this factual issue which was decided against the Mall in the initial proceedings and which it may not now relitigate.

The doctrines of collateral estoppel and *res judicata* apply with full force to proceedings in bankruptcy court. *Katchen v. Landy*, 382 U.S. 323, 334, 86 S.Ct. 467, 475, 15 L.Ed.2d 391 (1966); *Chicot County Drainage District v. Baxter State Bank*, 308 U.S. 371, 375, 60 S.Ct. 317, 319, 84 L.Ed. 329 (1940). Collateral estoppel precludes relitigation of an issue of fact when 1) the issue is identical to an issue actually litigated in a prior proceeding, 2) determination of that issue was necessary to the resolution of the earlier proceeding, and 3) the opportunity to litigate was "full and fair." *Sprecher v. Graber*, 716 F.2d 968, 972 (2d Cir.1983), *quoting Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 332, 99 S.Ct. 645, 652, 58 L.Ed.2d 552 (1979). There is no question here that the third requirement was satisfied.

Whether a firm offer to assume the lease was outstanding throughout the Au-

gust to January proceeding was a question Chief Judge Ryan was constitutionally required to resolve before rendering a judgment. Article III of the Constitution grants federal courts jurisdiction only over "cases" and "controversies"; conversely, it forbids the rendering of purely advisory opinions. U.S. Const., art. III, § 2; *Golden v. Zwickler*, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969). If the Hills offer had lapsed during the adjudication, a pronouncement upon the question of its potential assumption of the lease could have had no practical effect. It would thus have been a constitutionally impermissible advisory opinion. Avoidance of such decisions is of such importance that even if neither party had raised the issue, Chief Judge Ryan was under a duty to inquire into the "live" nature of the Hills offer on his own. *Juidice v. Vail*, 430 U.S. 327, 331, 97 S.Ct. 1211, 1215, 51 L.Ed.2d 376 (1977). That a good faith offer existed at the commencement of the adjudication did not confer permanent jurisdiction. If the offer lapsed, the controversy would have become moot, and the bankruptcy court would have been divested of jurisdiction. *See North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971). Thus, a finding that the Hills offer continued to be open on January 21, 1981, was a necessary prerequisite to any decision on the merits of City Stores' application.

That the finding was necessary does not, however, imply that it was actually litigated. The purpose of collateral estoppel is not to foreclose the right of a party to put contested issues of fact before a trier of fact. It is intended to prevent their submission twice. A party is not foreclosed by collateral estoppel, for example, from litigating an issue of fact which could have served as an affirmative defense in an earlier action but was never raised in the earlier action. *Bloch v. Mill Factors Corp.*, 119 F.2d 536, 538 (2d Cir.1941). On the same theory, if City Stores and the

---

1. The Mall has made no attempt to defend the legal sufficiency of its original claim. A contrary assumption on the issue of amendment would therefore dictate affirmance of Chief Judge Ryan's order as essentially unchallenged.

Mall simply assumed that a live offer existed without presenting the question to the Court, litigation of the issue would not now be foreclosed. This is not, however, what happened. Although the question is a close one, I find that this issue was actually raised and litigated during the initial proceedings.

■ Several factors influence my decision. First, the potential existence of a mootness problem was plain from the face of City Stores' moving papers, which disclosed that at the time the Order to Show Cause was filed the offer was due to expire within two weeks. Exhibit D, Application, at ¶ 4. Thus both Chief Judge Ryan and the Mall were alerted to this threat to the court's jurisdiction. Second, evidence bearing on the issue was introduced without objection into the record. At the September 16 session, a Hills vice president stated that the Hills offer was outstanding. Transcript, September 16, 1980, at 180. The Mall neither cross-examined the witness on this point nor proffered contradictory evidence.

Third, the Mall's counsel brought the issue of whether an offer still existed to the Chief Judge's attention. On October 2, Mr. Schwarz commented during argument, "... your Honor, in fact it is not even clear that there is at this particular time an offer from Hills." Transcript, October 2, 1980, at 11. In addition, the opening colloquy of the October 28 hearing was devoted to a discussion among counsel and Court as to whether a live offer existed. Transcript, October 28, 1980, at 2–3. Thus, counsel for the Mall was clearly aware of the issue.

These three factors, when combined with the fundamental importance of the issue, convince me that this issue must be considered to have been litigated. The parties and the Court were aware of the issue, evidence was introduced relative to it, and counsel for the Mall emphasized its importance by commenting on it to the Court. Although it is true that neither side clearly labelled it as a jurisdictional issue, I cannot

assume that Chief Judge Ryan was not aware of its fundamental importance. Further, the comments on the issue by counsel demonstrate that all involved recognized that the issue was important. Thus counsel for City Stores presented evidence on the issue and counsel for the Mall set it at issue by challenging the showing through argument on October 2 and October 28. This is what "actually litigated" means.

It is true that Chief Judge Ryan made no specific findings on the issue, but that is hardly surprising since the evidence supporting the proposition was uncontradicted. Although the Mall questioned whether there was a live offer, it introduced no evidence contradicting the testimony offered by City Stores. I cannot accept that, given the issue's importance, the Chief Judge simply overlooked it.

Nor does the Mall's failure to introduce evidence indicate that the issue was not litigated. Counsel for the Mall plainly recognized the issue's importance, and he had a thorough opportunity to discover and present facts countering City Stores' contention. Counsel cannot waive such an opportunity and later claim that this waiver preserves his right to litigate. Of course, if the contradictory evidence was unavailable at the time of the initial hearings, the issue could have been reopened. Counsel for the Mall, however, makes no such contention.

As I say, the issue of actual litigation is a close one. While I would be more comfortable with the result if the parties had expressly mentioned and argued mootness or if Chief Judge Ryan had made express findings on the point, that the Mall's counsel twice mentioned the issue to the Court convinces me that he knew it to be a significant issue of fact which was in question. Indeed, he challenged City Stores' position, albeit inadequately. Given these circumstances, it is fair to hold that the Mall has litigated the issue of the existence of a live offer after August 18 [2] and may not do so

---

**2.** The Mall attempts to avoid this result by arguing that while there is testimony in the record

supporting the existence of a live offer in mid-September, 1980, when the only testimony was

again. Since this factual predicate for the Mall's claim of bad faith interference with contract has been litigated adversely to its interests, its claim fails as a matter of law. Chief Judge Ryan was correct in dismissing it without further inquiry into the merits of the claim, and his June 10, 1981 order is affirmed.

### City Stores' Appeal (No. 82 Civ. 6091)

City Stores' 1982 appeal also involves Chief Judge Ryan's January 1981 judgment, which held that City Stores was free to assign the Loveman's lease to Hills. As mentioned above, one ground for the Mall's objection to the assignment was that City Stores no longer had the power to assign, for it had breached § 13(b) of the lease by vacating the department store. Such a breach permitted the Mall to terminate the lease and re-take possession, and it had attempted to do so. The Chief Judge rejected this theory, however, holding that the Mall had waived its right to terminate on account of this breach by failing to object upon learning of the planned liquidation sale and by accepting rent following the departure. Thus the Mall was estopped from asserting the breach as a ground for termination.

Neither side challenged this finding at the time, nor is it directly challenged now. In December, 1980, however, while the above-mentioned decision was still *sub judice*, the Mall mailed to City Stores a notice of default premised upon its continued failure to occupy the store. The Mall had stopped accepting rent after July and by December wished to re-enter the premises. After the Chief Judge's judgment was entered, City Stores moved for a temporary restraining order and preliminary injunction preventing the Mall from acting on the notice of default. Chief Judge Ryan initially granted both requests. At a February 4, 1981, oral hearing, however, the Chief Judge dissolved the preliminary injunction upon being told that Hills would not assume the lease, commenting that "the landlord is now permitted to do whatever its rights are under the lease." Tr., February 4, 1981, at 28. The Mall proceeded to demand the keys to the store, and on February 14, 1981, City Stores surrendered them.

Soon thereafter, on April 13, 1981, the Mall submitted a claim for $1.6 million in damages premised upon Section 22 of the lease, which provides that, *inter alia*, damages are available following termination of the lease by reason of the tenant's default. City Stores moved to expunge the claim, contending that the only actionable default, its departure, had been waived. Chief Judge Ryan denied the motion to expunge in an order filed July 29, 1982, although he reduced the amount of the claim, finding that the waiver had been merely temporary. It is this order which City Stores appeals. It contends that the Mall's 1980 actions constituted a permanent waiver of its right to object to City Stores' conceded breach of the lease.

It is useful initially to determine exactly what type of waiver was created by the Mall's action. Although "waiver" is often spoken of as a single doctrine, several distinct concepts are subsumed under the label. As Williston points out, a substituted contract, election, promissory estoppel, a promise not to insist upon performance, and laches are all grounds for finding waiver. W. Jaeger, *Williston on Contracts* § 679 (3d ed. 1961). As the Chief Judge's findings of fact make clear, waiver in the instant case was primarily based upon election. When City Stores breached the lease, the Mall had the option of ignoring the breach and accepting rent or of immediately declaring default and re-entering. It

taken, there is none demonstrating a live offer between that time and August 18, when the original offer was made. Assuming the point *arguendo*, I find it irrelevant. The Mall seeks to show that City Stores pursued the lease assignment proceedings to interfere with the Mall's contract. Such a cause of action requires the Mall to show that City Stores' motive was un-

mixedly malicious. *Sadowy v. Sony Corp.*, 496 F.Supp. 1071, 1080 (S.D.N.Y.1980). Since City Stores had a rational expectation of the continuing viability of the Hills offer—as the facts which the Mall may not now challenge demonstrate—its continued pursuance of the litigation constituted no tort, for it then had a legitimate economic motive for its actions.

chose the former. February decision, at 11.

To some extent there may also have been elements of estoppel, although there is no evidence of promissory estoppel. To explain this the facts must be recounted in greater detail. The decision to vacate the store was apparently arrived at prior to any action by the Mall. Two days before the closing, however, a City Stores officer informed the Mall's president of the decision, stating that City Stores wished to convey the lease by July 31, 1980. The president thereupon agreed to work with City Stores to find an acceptable tenant. February decision, at 12. Later, the Mall sent a notice of default, but the Mall's president privately told City Stores "not to worry" about the notice. The Mall continued to accept rent payments from City Stores for three or four months. February decision, at 12–13.

Thus there were grounds for finding that the Mall was estopped from thwarting the efforts of City Stores to find a new tenant which were undertaken soon after the closing. The Mall's president had implicitly assented to City Stores' installation of a new tenant before July 31. He had also implied that the Mall would not terminate the lease during that time. City Stores could reasonably have relied on these representations in exerting itself in trying to find a new tenant, and the Mall could be equitably estopped from depriving City Stores of the fruits of these efforts.

It is worth noting, however, that there is no evidence that City Stores relied on these representations in making its decision to close the store. The decision was apparently made before the Mall became involved. Further, any reliance would have been unreasonable, for the evidence indicates that the Mall's president was only told of—and thus could only have been reasonably understood to have assented to—a vacancy lasting until July 31. There is no indication that the president indicated that he would be willing to forgo termination of the lease indefinitely.

I undertake this analysis because it throws into relief the equities involved in the Chief Judge's decision. It is undisputed that the covenant to occupy the store was an important component of the lease. Occupied "anchor" department stores are essential in attracting customers to a large shopping mall, as all parties were aware. City Stores decided to close the Loveman's store, despite having no reason, so far as appears from the record, to think that it would not then be subject to termination of the lease and assessment of damages under Section 22. Indeed, it perhaps should have expected such a reaction, for the vacant store was likely to damage the Mall. Its breach of this term of the lease was in no way made in reliance upon any representations by the Mall that it would indefinitely forgo termination. Thus the equitable basis for permanent estoppel is entirely lacking.

City Stores is in effect asking me to find that the Mall permanently waived enforcement of this valuable covenant by its election to accept three months' rent. In the absence of some equitable basis for finding estoppel, I cannot do so. As Justice Cardozo commented in discussing election of remedies for breach of a contract for the sale of land, "some element either of ratification or estoppel is at the root of most cases, if not all, in which an election of remedies, once made, is viewed as a finality." *Schenck v. The State Line Telephone Co.*, 238 N.Y. 308, 312, 144 N.E. 592 (1924). The Restatement of Contracts echoes this requirement: under Section 247, a party's acceptance of defective performance due to non-occurrence of a condition works to forfeit the party's right to later object to such non-occurrence "to the extent that [the prior acceptance] justifies the obligee in believing that subsequent performances will be accepted in spite of that non-occurrence." 2 Restatement (Second) of Contracts § 247 (1981). In other words, under Section 247 only if City Stores had some reason to believe from the Mall's behavior that the Mall would never insist on fulfillment of the occupancy clause could it treat the clause as waived. As discussed above,

no such reason for reliance was present. Although City Stores points out the "irreversible" nature of its decision to vacate, the evidence indicates that that decision was made before City Stores had any reason to think it would not immediately be subject to the type of damages now sought. Further, there is no evidence in the record from which it can be concluded that City Stores was ever given any ground for reasonably believing that these damages would not be sought after July 31, 1980. Thus there is no "ratification or estoppel" on which a final election could be premised. Under Justice Cardozo's dictum, the Mall was free to terminate when it did, and Chief Judge Ryan so held.

It must be admitted that some of the cases cited by City Stores in support of its appeal appear upon cursory analysis to require a contrary result, for their language is quite broad. Upon close scrutiny, however, each reveals some ground for finding estoppel. In *Ireland v. Nichols*, 46 N.Y. 413 (1871), for example, the tenant sublet part of the property without the written consent by the landlord required by the lease. The tenant had, however, informed the landlord of the sublet before and after the sublessee moved in. The landlord voiced no immediate objection and accepted rent for several months following the sublet. When he finally sued for forfeiture of the premises, the Court of Appeals found his right to object waived.

The significant difference between *Ireland* and the instant case is in the nature of the substantive covenants in the two actions. The *Ireland* covenant did not forbid subletting; it simply made any sublet conditional on landlord approval. The purpose of the provision was not to eliminate subtenancy but to give the landlord a chance to control the selection of a subtenant. By informing the landlord prior to subletting, the tenant provided an opportunity for the requisite exercise of control. The landlord's failure to take advantage of this opportunity justified the estoppel, for the tenant relied on the landlord's implicit approval. Here, by contrast, City Stores' actions in no way fulfilled the purpose of the covenant at issue, since the purpose was not to provide the Mall with a chance to object but to prevent or compensate the damage vacancy inevitably causes.

*Murray v. Harway*, 56 N.Y. 337 (1874) is quite similar to *Ireland*. The lease required written consent to an assignment. 56 N.Y. at 340. Such consent was not obtained by the tenant but the landlord knowingly accepted rent from the assignee. Again the landlord was given an opportunity to exercise the right granted by the violated covenant; therefore, it could equitably be estopped from denying the implications of its action, that is, that it approved of the assignee.

The other cases cited by City Stores similarly reveal equitable grounds, such as the passage of time or a substantial investment by the tenant following the landlord's implicit consent, which made it equitable to estop the landlord from denying that the election was final. *See, e.g., Radcliffe Associates, Inc. v. Greenstein*, 274 A.D. 277, 82 N.Y.S.2d 680 (1948) (landlord's failure to enforce restrictive covenant for fourteen years); *Adams-Flanigan Co. v. Kling*, 198 A.D. 717, 191 N.Y.S. 32 (1921), *aff'd.*, 234 N.Y. 497, 138 N.E. 421, *cert. denied*, 260 U.S. 741, 43 S.Ct. 98, 67 L.Ed. 491 (1922) (tenant's substantial investment following landlord's alleged oral consent and acceptance of rent); *Vendramis v. Frankfurt*, 86 N.Y.S.2d 715 (Sup.Ct.1949), *aff'd.*, 276 A.D. 903, 94 N.Y.S.2d 903 (1950) (landlord's failure to enforce restrictive covenant for eight years); *Ditmas Apartments, Inc. v. Coster*, 196 Misc. 728, 94 N.Y.S.2d 634 (Sup.Ct.1949) (landlord's failure to enforce restrictive covenant for six years); *Sol Apfel, Inc. v. Kocher*, 61 N.Y.S.2d 508 (Sup. Ct.1948), *aff'd.*, 272 A.D. 758, 70 N.Y.S.2d 138 (1947) (substantial investment by tenant following landlord's knowing acquiescence in breach of restrictive covenant); *Paul Pleating & Stitching Co. v. Levine*, 137 Misc. 82, 242 N.Y.S. 729 (Mun.Ct.1930) (no permanent waiver found; landlord es-

topped from changing without prior notice custom of consenting to violation of lease).[3]

City Stores demonstrated to Chief Judge Ryan no equitable factors which would justify the estoppel which must be present before an election not to enforce a lease covenant will be deemed final. It is true that City Stores substantially changed its position in vacating the store, but the decision to do so was apparently arrived at without regard to the actions of the Mall. In any event, City Stores demonstrated no reliance. The Mall waited only a few months before insisting on forfeiture, and it never gave City Stores reason to think that its initial forbearance would extend indefinitely. There is no ground for finding a permanent waiver.

Both orders are affirmed. The Clerk of the Court is directed to dismiss both actions.

It is SO ORDERED.

---

3. The parties have apparently assumed that New York law applies, although the contacts of the case are primarily with Alabama. Since there is no showing that the law of New York and Alabama are at all in conflict, I do not reach the choice of law question.